# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KENAN BRAXTON,<br>1901 D St SE<br>Washington, DC 20003<br><br>STANLEY PETTY, and<br>1901 D St SE<br>Washington, DC 20003<br><br>MICHAEL DUNBAR<br>1901 D St SE<br>Washington, DC 20003<br><br>        Plaintiffs-Petitioners,<br>        *Individually and on behalf of*<br>        *all others similarly situated*<br><br>        v.<br><br>UNITED STATES PAROLE<br>COMMISSION,<br>90 K Street NE, 3rd Floor<br>Washington, DC 20530<br><br>PATRICIA K. CUSHWA, *in her official*<br>*capacity as Acting Chairman of the United*<br>*States Parole Commission,*<br>90 K Street NE, 3rd Floor<br>Washington, DC 20530<br><br>PAMELA BONDI, *in her official capacity*<br>*as Attorney General of the United States*, and<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br><br>JOE PAGE III, *in his official*<br>*capacity as Warden of the D.C. Jail*<br>1901 D St SE<br>Washington, DC 20003<br><br>        Defendants-Respondents. | Case No. 25-cv-3534 |

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRITS OF HABEAS CORPUS

Plaintiffs Kenan Braxton, Stanley Petty, and Michael Dunbar ("Plaintiffs") on behalf of a class of similarly situated individuals on supervised release or parole for D.C. Code offenses, allege as follows:

### PRELIMINARY STATEMENT

This case is about a federal agency that has been abolished by Congress but is continuing its "normal operations" unabated. Plaintiffs are individuals who have been arrested and detained by the United States Parole Commission ("Commission" or "Parole Commission"), an agency that Congress decided to abolish over 40 years ago. This decades-long "quandary" of the Commission's continued existence finally ended when its enabling statute expired last night, on September 30, 2025. But the Commission has decided to ignore Congress and instead continue jailing individuals who allegedly violated the conditions of their supervision. These individuals are either accused of solely technical violations of supervision or have been released by a judge in their criminal matter. Because the Commission does not have Congressional authority to exist, let alone issue arrest warrants and incarcerate individuals, the Court should declare the Commission's actions unlawful and release Plaintiffs and putative class members from custody.

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, because it presents a federal question under federal laws.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants are located in this judicial district, Plaintiffs are incarcerated in this district, and Plaintiffs' claims for relief arose in this district.

1

## PARTIES

3. Plaintiff Kenan Braxton is a 51-year-old individual on supervised release who the Parole Commission is holding at the D.C. Jail pending a final revocation hearing for alleged technical violations of supervised release, currently scheduled for October 29, 2025.

4. Plaintiff Stanley Petty is a 57-year-old individual on supervised release who the Commission is holding at the D.C. Jail pending a probable cause hearing for alleged violations of supervised release, currently scheduled for October 6, 2025.

5. Plaintiff Michael Dunbar is a 30-year-old individual on supervised release who the Parole Commission is holding at the D.C. Jail. The Commission held a revocation hearing for Mr. Dunbar on October 1, 2025—following the Agency's expiration—and a hearing examiner recommended that any further revocation proceedings be suspended while he participates in a months-long program at the D.C. Jail. As of the date of this filing, Mr. Dunbar is awaiting the Commission's decision as to this recommendation.

6. Defendant United States Parole Commission is the federal agency responsible for the administration of parole and supervised release in Washington, D.C., including decisions regarding the continuation, termination, and revocation of their supervision.

7. Defendant Patricia K. Cushwa is sued in her official capacity as Acting Chairman of the United States Parole Commission. In this capacity, Defendant Cushwa oversees the operations of the United States Parole Commission.

8. Defendant Pamela Bondi is sued in her official capacity as the Attorney General of the United States.

9. Defendant Joe Page III, Plaintiffs' immediate custodian, is the Warden of the D.C. Jail, where Plaintiffs are incarcerated, and is being sued in his official capacity.

## BACKGROUND

### Parole and Supervised Release in the District of Columbia

10. This case concerns people on parole or supervised release for D.C. Code felony offenses in the District of Columbia.

11. Until today, both groups of people on supervision have, for decades, been subject to the authority of a federal agency: The United States Parole Commission.

12. This federal agency was initially established in order to supervise individuals on parole in the federal system. The Commission's involvement in federal cases has been almost entirely replaced by federal court supervision since the adoption of the federal determinate sentencing system in 1984.

13. But in 1997, the Commission assumed the responsibilities of the D.C. Board of Parole, and it assumed jurisdiction over those on parole or supervised release in Washington, D.C. National Capital Revitalization and Self-Government Improvement Act of 1997 (Pub. L. No. 105-33).

14. In this role, the Commission has been responsible for the administration of parole and supervised release in D.C.

15. The Commission decides, for example, which general and special conditions of supervision are imposed on each individual released on parole or supervised release. The Commission issues warrants for the arrest of those on supervision whom it believes have violated their conditions of release.

16. Unlike criminal proceedings, these arrests of people on supervision are not always the result of criminal conduct. Instead, they are frequently the result of administrative violations

of conditions of release—known as "technical violations"—which may include missing an appointment with a supervision officer or failing to attend a required program.

17. Those arrested by the Commission who face local revocation hearings generally do not include those who have been detained by a judge or found guilty of criminal conduct—rather, if someone is facing criminal charges (as opposed to solely alleged technical violations) a Commission warrant is only executed if and when the subject is released by the court.

18. At the conclusion of these hearings, the Commission may revoke the individual's term of supervision and impose a term of incarceration.

19. When someone's supervision is revoked, even as a result of technical violations, lengthy periods of incarceration can ensue.

**Congress Abolished Parole and the Parole Commission in 1984**

20. Congress provided for the abolition of the Commission over forty years ago.

21. In 1984, through the Comprehensive Crime Control Act, Congress sought to fundamentally transform sentencing in the United States.

22. It abolished the "outmoded" "model of 'coercive' rehabilitation," where an individual would have to prove that they were "rehabilitated" in order to be released from prison on parole. S. Rep. No. 98-225, at 38, 40 (1983).

23. As the Senate Judiciary Committee explained over forty years ago, such a model is outdated because it "was based on the vices of the indeterminate sentence regime of prior law, under which the effective time of incarceration was determined, not by the sentencing judge, but by the Parole Commission endeavoring to decide when the prisoner had been 'rehabilitated.'" *United States v. Maier*, 975 F.2d 944, 947 n.1 (2d Cir. 1992) (referencing S. Rep. No. 98-225).

4

24. The result of that parole-based scheme presided over by the Parole Commission was an "unjustifiably wide range of sentences" and "disparate release dates" which "are the result of the wide discretion granted to sentencing judges and the United States Parole Commission" under the earlier federal law. S. Rep. No. 98-225, at 38 & n.6.

25. Congress thus abolished the federal parole system and provided for the abolition of the Commission on November 1, 1992.

26. In lieu of this "model of 'coercive' rehabilitation," S. Rep. No. 98-225, at 40, Congress replaced parole with supervised release system, which is governed entirely by judicial decisionmakers. *See* 18 U.S.C. § 3583(e)(3) ("The court may . . . revoke a term of supervised release.[]"); Fed. R. Crim. P. 32.1(b)(2) ("[T]he court must hold the revocation hearing[.]").  It also created the United States Sentencing Commission to enact sentencing guidelines.

27. The purpose of the reforms in 1984 were to "promote more uniform sentencing by establishing a commission to set a narrow sentencing range for each Federal criminal offense; require courts to explain in writing any departure from sentencing guidelines; and authorize defendants to appeal sentences harsher, and the Government to appeal sentences more lenient, than the sentencing commission guidelines." 130 Cong. Rec. 31,792 (Oct. 11, 1984).

28. In other words, Congress intended "to make the time actually served by [individuals in prison] more standardized and predictable." *Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1093 (D.C. Cir. 2022).

29. This newly-created system thus replaced agency-decision making over parole cases with judicial decision-making over supervised release cases. *See* 18 U.S.C. § 3583(e)(3); Fed. R. Crim. P 32.1(b)(2); *United States v. Nishida*, 53 F.4th 1144, 1150 (9th Cir. 2022) (noting, in a supervised release case, that "a nonjudicial officer 'may not decide the nature or extent of the

punishment'" imposed because "'under our constitutional system the right to . . . impose the punishment provided by law is judicial'").

30. The abolition of parole in the District followed soon after its abolition in the federal system, when Congress "borrowed and incorporated" the federal supervised release system into the D.C. Code. *See* Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* 19 (2005).

31. Like its federal counterpart, supervised release in Washington, D.C. is "significant[ly] differen[t]" from parole, as the "purpose[] of supervised release" is "rehabilitation and reintegration into the community rather than further punishment or incapacitation." *Id.* at 16. It replaces a system that "frequently results in decisions that lack consistency or predictability," with a system designed to increase certainty and uniformity in sentencing.[1]

**The Abolition of the Parole Commission Went into Effect on October 1, 2025**

32. Following Congress's decision to abolish the Commission over four decades ago, the Commission has only continued to exist pursuant to extensions of its expiration date.

33. Prior to the initial repeal date on November 1, 1992, for example, Congress extended the date until 1997. Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 316, 104 Stat. 5089, 5115 (1990) (extending the period by five years).

34. In 1996, Congress added five additional years to this phase-out period in order "to oversee cases of prisoners sentenced under prior law." Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, § 2, 110 Stat. 3055, 3055 (1996). In that law, Congress also "reduce[d] the size of the Parole Commission." *Id.*

---

[1] Justice Policy Institute, *Restoring Local Control of Parole to the District of Columbia* 41 (Dec. 2019), https://justicepolicy.org/wp-content/uploads/2022/02/DCParoleStudy.pdf.

6

35. Over time, and in light of the abolition of parole, the population of people on parole and people serving parole-able sentences has decreased.

36. And as parole has been phased out, Congress's extensions to the Commission's phase out date have shortened. Since 2022, Congress has extended this date nearly a dozen times, most often by a matter of months.

37. In a Continuing Budget Resolution in September of 2024, Congress extended the Commission's expiration date for "the period covered by this Act," or until December 20, 2024. Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, §§ 106(3), 121, 138 Stat. 1524, 1526, 1528 (2024).

38. In December of 2024, Congress extended this date until March 14, 2025. American Relief Act, 2025, Pub. L. No. 118-158, § 101(1), 138 Stat 1722 (2024).

39. And in March of 2025, Congress extended this date until yesterday, September 30, 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1106, 1115, 139 Stat. 9, 15 (2025).

40. On September 30, 2025, for the first time, Congress did not extend the date of repeal of the Parole Commission, ending the four-decade long "quandary."

41. As a result, the "transition period" has concluded and the "expiration of the phaseout period and the complete dissolution of the Parole Commission" has taken effect. *Walden v. U.S Parole Comm'n*, 114 F.3d 1136, 1139 (11th Cir. 1997).

42. The expiration of the Commission was not merely a product of the government shutdown. The Commission's extensions are not tied to the budget—indeed, prior to recent years, Congress often extended the Commission's expiration date in stand-alone bills.

43. And the House Bill which the Senate was considering yesterday, and which ultimately failed to pass, did not provide for any extension of the Parole Commission's repeal.[2] Thus, even if Congress funded the government via H.R. 5371, the Commission's authority would have expired.

44. And this omission of an extension for the Commission is not for lack of awareness. Congress has repeatedly extended the Commission's lifeline in Continuing Resolutions just like this for years.

45. Moreover, another proposed budget, which was offered nearly two weeks prior to the shutdown and was never passed by either Congressional body, did provide for additional extension for the Commission.

46. Yet it was notably absent from the bill that the Senate voted on last night.

## NAMED PLAINTIFF ALLEGATIONS

47. **Plaintiff Kenan Braxton** is a 51-year-old grandfather currently being held at the D.C. Jail by the United States Parole Commission pending a final revocation hearing for alleged technical violations of his supervised release.

48. Mr. Braxton has been in the community and on supervision since February 10, 2024 following his 2023 convictions for assault with a dangerous weapon and unlawful possession of a firearm.

49. He completed several special conditions of supervision and tested negative for substances during this time. Because of his medical challenges, Mr. Braxton was seeking disability benefits and spent his time helping to care for his two young grandchildren.

---

[2] *See* H.R. 5371, Continuing Appropriations and Extensions Act, 2026, available at https://www.congress.gov/bill/119th-congress/house-bill/5371.

8

50. In August 2025, Mr. Braxton was hospitalized. He alerted his CSO several times of his status throughout his hospitalization.

51. He was arrested on September 10, 2025, pursuant to a Parole Commission warrant that alleged he had failed to submit to drug testing and report to his supervising officer on a handful of occasions in July and August, including when he was in the hospital.

52. During a probable cause hearing held on September 12, 2025, Mr. Braxton's counsel presented evidence that for three of the alleged dates Mr. Braxton failed to submit to drug testing, he was hospitalized. He attempted to report for drug testing on August 7, 2025, but it was not a testing date. Regarding his failure to report to his supervising officer, counsel presented evidence that Mr. Braxton was confused over when he had to report.

53. Probable cause was found on both violations and the hearing examiner ordered Mr. Braxton be held in custody pending his revocation hearing, which is scheduled for the end of this month. His upcoming October 29, 2025 hearing as well as his continued incarceration are unauthorized, as the Commission has not been authorized to conduct any functions after September 30, 2025.

54. **Plaintiff Stanley Petty** is a 57-year-old Black male who is on supervised release in Washington, D.C. and is currently being held at the D.C. Jail by the United States Parole Commission.

55. In 2021, Mr. Petty pleaded guilty to robbery and unlawful possession of a firearm and was subsequently sentenced to 66 months of incarceration, followed by three years of supervised release.

56. Mr. Petty completed the terms of incarceration and began his period of supervised release on July 11, 2025, where he was complying with supervision requirements and making a satisfactory adjustment.

57. On September 15, 2025, based on an interview with a complaining witness, Mr. Petty was arrested for misdemeanor simple assault and misdemeanor second-degree theft.

58. On September 16, 2025, the following day, Mr. Petty was promptly released back to the community by the Superior Court of the District of Columbia on his own personal recognizance and ordered to appear in court again on November 20, 2025.

59. The United States Parole Commission issued a warrant application for Mr. Stanley on September 19, 2025, which was executed on September 24, 2025.

60. Mr. Petty has been incarcerated at the D.C. Jail since, awaiting his probable cause hearing scheduled for October 6, 2025.

61. This probable cause hearing, as well as his continued incarceration, are unauthorized, as the U.S. Parole Commission does not have authorization to conduct any functions after September 30, 2025.

62. **Plaintiff Michael Dunbar** is a 30-year-old Black man who is on supervised release in Washington, D.C. and is currently being held at the D.C. Jail by the United States Parole Commission.

63. In 2023, Mr. Dunbar pleaded guilty to attempted second degree burglary, and was sentenced to 14 months of incarceration and three years of supervised release. Mr. Dunbar began serving his current term of supervised release on March 19, 2025.

64. On April 16, 2025, the Commission issued a warrant charging Mr. Dunbar with technical violations of supervised release and a new law violation related to the misdemeanor destruction of property.

65. Mr. Dunbar was held on a $50 cash bond in relation to the destruction of property case, which was subsequently dismissed on August 1, 2025. At that point, Mr. Dunbar was detained pursuant to the Commission warrant.

66. On August 8, 2025, the Commission held a probable cause hearing for Mr. Dunbar.

67. Mr. Dunbar stated that he has previously had issues with substance use, but has since resolved these issues.

68. The hearing examiner determined there was probable cause but that incarceration was not appropriate. Instead, she recommended that Mr. Dunbar be reinstated to supervision and released to the community to receive bed-to-bed treatment.

69. Despite this recommendation, on August 11, 2025, the Commission denied release and ordered Mr. Dunbar to be held in custody pending a revocation hearing. No reason was given for the denial of release.

70. On October 1, 2025, the Commission held a final revocation hearing for Mr. Dunbar.

71. At the hearing, Mr. Dunbar's counsel objected to the hearing, stating that the Commission's authorization had lapsed as of September 30, 2025 and that the Commission thus had no authority to hold a revocation hearing. The hearing examiner stated that the Commission had been directed by the Attorney General to continue operations.

72. The examiner recommended that Mr. Dunbar remain at the D.C. Jail and complete the Residential Substance Abuse Treatment Program (RSAT), an inpatient substance abuse

11

program there, and suspended any further revocation proceedings pending his completion of RSAT.

73. As of the date of filing, the Commission has not issued a Notice of Action in response to this recommendation.

74. Mr. Dunbar remains at the D.C. Jail, unable to access the community-based substance abuse treatment that a hearing examiner previously recommended for him.

75. His October 1, 2025, revocation hearing as well as his continued incarceration are unauthorized, as the Commission has not been authorized to conduct any functions after September 30, 2025.

## CLASS ALLEGATIONS

76. Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs seek to represent a class of all people financially unable to obtain adequate representation who are on supervised release or parole for D.C. Code offenses and who are or will be detained solely by the Parole Commission and are pending action by the Parole Commission at midnight on October 1, 2025, or later.

77. Plaintiffs reserve the right to amend or modify the class definitions or to establish sub-classes as appropriate if discovery or further investigation reveals that the class should be expanded or otherwise modified.

78. The class meets the prerequisites of Federal Rule of Civil Procedure 23(a).

79. Numerosity (Rule 23(a)(1)): The class is so numerous that joinder is impracticable. The class currently consists of dozens of individuals detained at the D.C. Jail by the Commission. The class will continue to grow as Defendants unlawfully issue warrants for and cause the arrest and detention of additional individuals based on alleged violations of parole or supervised release. Indeed, the Commission holds hundreds of revocation hearings a year. *See* United States Parole

Commission Congressional Report (FY 2022) at 11 (noting that the Commission held 288 revocation hearings for people on supervised release in 2022). The class is thus numerous.

80. Joinder is also inherently impracticable because the number of unnamed, future class members is unknown and will continue to rise as more people are arrested pursuant to a Parole Commission warrant, detained pending revocation, and subject to additional terms of incarceration after revocation.

81. Joinder is impracticable also because proposed class members are highly unlikely to file individual suits on their own behalf given practical barriers, including indigency.

82. Commonality (Rule 23(a)(2)): The claims of the class share common issues of law, including but not limited to whether the Parole Commission is legally authorized to take any action, including detain people after it has been abolished by Congress.

83. Typicality (Rule 23(a)(3)): The claims of the named Plaintiffs are typical to the class: they are all unlawfully detained by the Commission, an agency that Congress has abolished.

84. Adequacy (Rule 23(a)(4)): Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflict of interest with other class members, will fairly and adequately protect the interests of the class, and understand their responsibilities as class representatives. Counsel for Plaintiffs have experience litigating class actions, cases involving the rights of people on supervision, and legal violations by the United States Parole Commission.

85. Defendants have acted, and will act, on grounds generally applicable to the class, thereby making relief appropriate as to the class as a whole. The class may therefore properly be certified under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*
*On Behalf of All Class Members and Against all Defendants*

86. The APA requires the "reviewing court" to "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

87. As of midnight on October 1, 2025, the Commission's authority to issue warrants, detain people, revoke supervision, and impose further terms of incarceration has lapsed.

88. Thus, the Commission's conduct towards Plaintiffs—including issuing warrants, detaining them at the D.C. Jail pending probable cause and revocation hearings, and potentially revoking their supervision—is unlawful and "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2).

89. Plaintiffs and proposed class members have "suffer[ed]," and will "suffer[] legal wrong because" of Defendants' actions. 5 U.S.C. § 702.

### SECOND CLAIM FOR RELIEF
### *Ultra Vires* Action
*On Behalf of All Class Members and Against all Defendants*

90. The Commission has acted, and continues to act, *ultra vires*—that is, the Commission has acted and continues to act in excess of its statutory and regulatory authority—by depriving individuals of their liberty following the Commission's expiration.

91. Judicial review is available "to determine whether the agency has acted *ultra vires*—that is, whether it has exceeded its statutory authority." *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (internal quotations omitted) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).

14

92. This doctrine is available when an agency's action is "blatantly lawless." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022).

93. Here, Defendants are detaining Plaintiffs at the D.C. Jail pursuant to the authority of an Agency that has been abolished. Defendants are thus acting in excess of their authority, or *ultra vires*.

94. As a result of the Commission's *ultra vires* actions, Plaintiff and proposed class members suffer injury: their detention at the D.C. Jail and potential further terms of incarceration, a serious restraint on their liberty. *See Jones v. Cunningham*, 371 U.S. 236, 242 (1963).

### THIRD CLAIM FOR RELIEF
### Writ of Habeas Corpus, 28 U.S.C. § 2241
*On Behalf of All Class Members and Against all Defendants*

95. 28 U.S.C. § 2241 allows this Court to grant a writ of habeas corpus because class members, including named Plaintiffs, are "in custody in violation of the . . . laws . . . of the United States."

96. Plaintiffs are being detained at the D.C. Jail pursuant to the authority of the Parole Commission. But effective last night, Congress has abolished the Commission.

97. The Commission therefore lacks authority to imprison class members, and their continued detention is in violation of the law.

### RELIEF REQUESTED

Wherefore, Plaintiffs and proposed class members respectfully request that the Court:

A. Order the release of Plaintiffs and putative class members from unlawful detention because Defendants lack authority to take any action, including issue warrants, detain, revoke, or subject them to a further term of incarceration;

B. Enjoin the Commission from taking any action against Plaintiffs and putative class members, including issue warrants, detain, revoke, or subject them to a further term of incarceration;

C. Declare that the Commission lacks authority to act, including to issue warrants, detain, revoke, or subject individuals to a further term of incarceration, and that these actions can only be undertaken by a judicial officer;

D. Provisionally certify the proposed class under Rule 23, and appoint the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

E. Award such further relief as the Court deems appropriate.

Dated: October 1, 2025              Respectfully Submitted,

*/s/ Hanna M. Perry*
Hanna Perry (D.C. Bar No. 90003756)
Zoé Friedland (D.C. Bar No. 1781910)
Teressa Hamsher (D.C. Bar No. 90009447)
Megan Yan (D.C. Bar No. 1735334)
Public Defender Service for the District of Columbia
633 3rd St. N.W.
Washington, D.C. 20001
Tel. 202-824-2198
Fax 202-824-2093
hperry@pdsdc.org
zfriedland@pdsdc.org
thamsher@pdsdc.org
myan@pdsdc.org