UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KENAN BRAXTON, et al.<br><br>*Plaintiffs-Petitioners,*<br><br>v.<br><br>UNITED STATES PAROLE COMMISSION, et al.<br><br>*Defendants-Respondents.* | Case No. 25-cv-3534<br><br>Hearing Requested |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This case is about a federal agency that has been abolished by Congress but is continuing its "normal operations" unabated. Plaintiffs are individuals who have been arrested and detained by the United States Parole Commission, an agency that Congress decided to abolish over 40 years ago. This decades-long "quandary" of the Commission's continued existence finally ended when its enabling statute expired last night, on September 30, 2025.[1] But the Commission has decided to ignore Congress and instead continue jailing individuals who allegedly violated the conditions of their supervision. These individuals are either accused of solely technical violations of supervision or have been released by a judge in their criminal matter. Because the Commission does not have Congressional authority to exist, let alone issue arrest warrants and incarcerate

---

[1] Letter from Patricia K. Cushwa, Chairman of the United States Parole Commission, *U.S. Parole Commission Transfer of Duties Plan* 1, https://www.documentcloud.org/documents/21092732-parole-commission-transfer-of-duties-plan-2019/.

individuals, the Court should declare the Commission's actions unlawful and release Plaintiffs and putative class members from custody.[2]

## BACKGROUND

### A. Parole and Supervised Release in the District of Columbia.

This case concerns people on parole or supervised release for D.C. Code felony offenses in the District of Columbia.[3] Until today, both groups of people on supervision have, for decades, been subject to the authority of a federal agency: The United States Parole Commission. This federal agency was initially established in order to supervise individuals on parole in the federal system. The Commission's involvement in federal cases has been almost entirely replaced by federal court supervision since the adoption of the federal determinate sentencing system in 1984. But in 1997, the Commission assumed the responsibilities of the D.C. Board of Parole, and it assumed jurisdiction over those on parole or supervised release for D.C. Code offenses. *See* National Capital Revitalization and Self–Government Act of 1997, Pub. L. No. 105–33, 111 Stat. 712, 745, D.C. Code § 24–131(a).

---

[2] This case is being filed as a putative class action, and a motion for class certification is forthcoming. The Court may provisionally certify the class and grant class-wide preliminary relief to stop Defendants' unlawful practices. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018).

[3] Which of these two forms of supervision—parole or supervised release—applies depends on when an offense was committed. Parole was abolished "for all District of Columbia offenses committed on or after August 5, 2000." *Williams v. United States*, 205 A.3d 837, 847 n.49 (D.C. 2019). Individuals whose offenses were committed prior to August 5, 2000 are eligible to seek release into the community under parole supervision, and whether an individual is released to parole is a discretionary decision made by the Commission. *See* D.C. Corrections Information Council, *United States Parole Commission (USPC) Docket*, https://cic.dc.gov/page/united-states-parole-commission-uspc-docket (last visited Oct. 1, 2025). Individuals whose offenses were committed on or after August 5, 2000 "receive[] a definite term of imprisonment followed by a specified period of supervised release." *Williams*, 205 A.3d at 847 n.49. Supervised release begins after an individual serves 85% of their sentence.

In this role, the Commission has been responsible for the administration of parole and supervised release in D.C. The Commission decides, for example, which general and special conditions of supervision are imposed on each individual released on parole or supervised release.[4] The Commission issues warrants for the arrest of those on supervision whom it believes have violated their conditions of release.[5] Unlike criminal proceedings, these arrests of people on supervision are not always the result of criminal conduct. Instead, they are frequently the result of administrative violations of conditions of release—known as "technical violations"—which may include missing an appointment with a supervision officer or failing to attend a required program.[6]

Those arrested pursuant to a Commission warrant who face local revocation hearings generally do not include those who have been detained by a judge or found guilty of criminal conduct—rather, if someone is facing criminal charges (as opposed to solely alleged technical violations) a Commission warrant is only executed if and when the subject is released by the court. At the conclusion of these hearings, the Commission may revoke the individual's term of supervision and impose a term of incarceration. *See* 28 C.F.R. §§ 2.103, 2.216. When someone's

---

[4] Criminal Justice Coordinating Council, *Parole and Supervised Release Sanctions* 9 (Sept. 2023), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/DC%20Parole%20and%20Supervised%20Release%20Sanctions%20%28September%202023%29.pdf ("The U.S. Parole Commission (USPC) is responsible for determining initial conditions of supervision, modification of supervision . . .").

[5] *Id.* (noting the USPC is responsible for "issuance of a warrant or summons for violation of a court order").

[6] Emilia Calma & Yesim Sayin, *Processing Through D.C.'s Criminal Justice System: Agencies, Roles, and Jurisdiction*, D.C. Policy Center (Mar. 2, 2023), https://www.dcpolicycenter.org/publications/criminal-justice-agencies-jurisdiction/ (describing technical violations as "missing meetings with [a] Community Supervision Officer, not submitting a drug test on time, testing positive for marijuana, and for new arrests, even if those arrests do not end in charges or conviction").

3

supervision is revoked, even as a result of technical violations, lengthy periods of incarceration can ensue.[7]

### B. Congress Abolished Parole and the Commission in 1984.

Congress provided for the abolition of the Commission over forty years ago. In 1984, through the Comprehensive Crime Control Act, Congress sought to fundamentally transform sentencing in the United States. It abolished the "outmoded" "model of 'coercive' rehabilitation," where an individual would have to prove that they were "rehabilitated" in order to be released from prison on parole. S. Rep. No. 98-225, at 38, 40 (1983). As the Senate Judiciary Committee explained over forty years ago, such a model is outdated because it "was based on the vices of the indeterminate sentence regime of prior law, under which the effective time of incarceration was determined, not by the sentencing judge, but by the Parole Commission endeavoring to decide when the prisoner had been 'rehabilitated.'" *United States v. Maier*, 975 F.2d 944, 947 n.1 (2d Cir. 1992) (referencing S. Rep. No. 98-225). The result of that parole-based scheme presided over by the Parole Commission was an "unjustifiably wide range of sentences" and "disparate release dates" which "are the result of the wide discretion granted to sentencing judges and the United States Parole Commission" under the earlier federal law. S. Rep. No. 98-225, at 38 & n.6.

Congress thus abolished the federal parole system and provided for the abolition of the Commission on November 1, 1992.[8] In lieu of this "model of 'coercive' rehabilitation," S. Rep.

---

[7] Court Servs. & Offender Supervision Agency, *Fiscal Year 2026 Congressional Budget Justification & Fiscal Year 2024 Agency Performance Report* 29 (June 12, 2025), https://www.csosa.gov/wp-content/uploads/2025/07/CSP-FY-2026-Congressional-Budget-Justification-and-FY-2024-Performance-Report.pdf

[8] The Comprehensive Crime Control Act of 1984 provided that the abolition would go into effect five years after the effective date of that legislation, Pub. L. No. 98-473, 98 Stat. 1976, 2032 (1984), which was ultimately November 1, 1987. *See* 98 Stat. at 2031 (1984) (initially setting the effective date as "twenty-four months after the date of enactment"); Pub. L. No. 99-217, 99 Stat.

No. 98-225, at 40, Congress replaced parole with supervised release system, which is governed entirely by judicial decisionmakers. *See* 18 U.S.C. § 3583(e)(3) ("The court may . . . revoke a term of supervised release.[]"); Fed. R. Crim. P. 32.1(b)(2) ("[T]he court must hold the revocation hearing[.]").  It also created the United States Sentencing Commission to enact sentencing guidelines.[9]

The purpose of the reforms in 1984 were to "promote more uniform sentencing by establishing a commission to set a narrow sentencing range for each Federal criminal offense; require courts to explain in writing any departure from sentencing guidelines; and authorize defendants to appeal sentences harsher, and the Government to appeal sentences more lenient, than the sentencing commission guidelines." 130 Cong. Rec. 31,792 (Oct. 11, 1984). In other words, Congress intended "to make the time actually served by [individuals in prison] more standardized and predictable." *Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1093 (D.C. Cir. 2022). This newly-created system thus replaced agency decision-making over parole cases with judicial decision-making over supervised release cases. *See* 18 U.S.C. § 3583(e)(3); Fed. R. Crim. P 32.1(b)(2); *United States v. Nishida*, 53 F.4th 1144, 1150 (9th Cir. 2022) (noting, in a supervised release case, that "a nonjudicial officer 'may not decide the nature or extent of the punishment'" imposed because "'under our constitutional system the right to . . . impose the punishment provided by law is judicial'").

---

1728 (1985) (extending the effective date of the Comprehensive Crime Control Act to 36 months after the date of enactment, or 1987).

[9] Brent E. Newton & Dawinder S. Sidhu, *The History of the Original United States Sentencing Commission 1985-1987*, 45 Hofstra L. Rev. 1167, 1181 (2017), available at https://scholarlycommons.law.hofstra.edu/cgi/viewcontent.cgi?article=2980&context=hlr.

The abolition of parole in the District followed soon after its abolition in the federal system, when Congress "borrowed and incorporated" the federal supervised release system into the D.C. Code. *See* Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* 19 (2005). Like its federal counterpart, supervised release in Washington, D.C. is "significant[ly] differen[t]" from parole, as the "purpose[] of supervised release" is "rehabilitation and reintegration into the community rather than further punishment or incapacitation." *Id.* at 16. It replaces a system that "frequently results in decisions that lack consistency or predictability,"[10] with a system designed to increase certainty and uniformity in sentencing.

### C. The Abolition of the Parole Commission Went into Effect on October 1, 2025.

Following Congress's decision to abolish the Commission over four decades ago, the Commission has only continued to exist pursuant to extensions of its expiration date. Prior to the initial repeal date on November 1, 1992, for example, Congress extended the date until 1997. Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 316, 104 Stat. 5089, 5115 (1990) (extending the period by five years). In 1996, Congress added five additional years to this phase-out period in order "to oversee cases of prisoners sentenced under prior law." Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, § 2, 110 Stat. 3055, 3055 (1996). In that law, Congress also "reduce[d] the size of the Parole Commission." *Id.*

Over time, and in light of the abolition of parole, the population of people on parole and people serving parole-able sentences has decreased. And as parole has been phased out, Congress's extensions to the Commission's phase out date have shortened. Since 2022, Congress

---

[10] Justice Policy Institute, *Restoring Local Control of Parole to the District of Columbia* 41 (Dec. 2019), https://justicepolicy.org/wp-content/uploads/2022/02/DCParoleStudy.pdf.

has extended this date nearly a dozen times, most often by a matter of months. In a Continuing Budget Resolution in September of 2024, Congress extended the Commission's expiration date for "the period covered by this Act," or until December 20, 2024. Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, §§ 106(3), 121, 138 Stat. 1524, 1526, 1528 (2024). In December of 2024, Congress extended this date until March 14, 2025. American Relief Act, 2025, Pub. L. No. 118-158, § 101(1), 138 Stat 1722 (2024). And in March of 2025, Congress extended this date until yesterday, September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1106, 1115, 139 Stat. 9, 15 (2025).

On September 30, 2025, for the first time, Congress did not extend the date of repeal of the Parole Commission, ending the four-decade long "quandary."[11] As a result, the "transition period" has concluded and the "expiration of the phaseout period and the complete dissolution of the Parole Commission" has taken effect. *Walden v. U.S Parole Comm'n*, 114 F.3d 1136, 1139 (11th Cir. 1997). The expiration of the Commission was not merely a product of the government shutdown. The Commission's extensions are not tied to the budget—indeed, prior to recent years, Congress often extended the Commission's expiration date in stand-alone bills. And the House Bill which the Senate was considering yesterday, and which ultimately failed to pass, did not provide for any extension of the Parole Commission's repeal.[12] Thus, even if Congress funded the government via H.R. 5371, the Commission's authority would have expired. And this omission of an extension for the Commission is not for lack of awareness. Congress has repeatedly extended the Commission's lifeline in Continuing Resolutions just like this for years. Moreover, another

---

[11] Letter from Patricia K. Cushwa, *supra* note 1.

[12] *See* H.R. 5371, Continuing Appropriations and Extensions Act, 2026, available at https://www.congress.gov/bill/119th-congress/house-bill/5371.

7

proposed budget, which was offered nearly two weeks prior to the shutdown and was never passed by either Congressional body, did provide for additional extension for the Commission.[13] Yet it was notably absent from the bill that the Senate voted on last night.

## NAMED PLAINTIFFS

### A. Kenan Braxton

Plaintiff Kenan Braxton is a 51-year-old grandfather currently being held at the D.C. Jail pending a final revocation hearing before the U.S. Parole Commission for alleged technical violations of his supervised released. Mr. Braxton has been in the community and on supervision since February 9, 2024 following pleading guilty in 2023 to assault with a dangerous weapon and unlawful possession of a firearm. He completed several special conditions of supervision and tested negative for substances during this time. Because of his medical challenges Mr. Braxton was seeking disability benefits and spent his time helping to care for his two young grandchildren.

In August 2025, Mr. Braxton was hospitalized. He alerted his CSO several times of his status throughout his hospitalization. He was arrested on September 10, 2025 pursuant to a Parole Commission warrant that alleged he had failed to submit to drug testing and report to his supervising officer on a handful of occasions in July and August, including when he was in the hospital.

During a probable cause hearing held on September 12, 2025, Mr. Braxton's counsel presented evidence that for three of the alleged dates Mr. Braxton failed to submit to drug testing, he was hospitalized. He attempted to report for drug testing on August 7, 2025, but it was not a

---

[13] *See* S. 2882, Continuing Appropriations and Extensions and Other Matters Act, 2026, available at https://www.congress.gov/bill/119th-congress/senate-bill/2882/text.

testing date. Regarding his failure to report to his supervising officer, counsel presented evidence that Mr. Braxton was confused over when he had to report.

Probable cause was found on both violations and the hearing examiner ordered Mr. Braxton be held in custody pending his revocation hearing, which is scheduled for the end of this month. His upcoming October 29, 2025 hearing as well as his continued incarceration are unauthorized, as the Commission has not been authorized to conduct any functions after September 30, 2025.

**B. Stanley Petty**

Stanley Petty is a 57-year-old Black male who is on supervised release in Washington, D.C. and is currently being held at the D.C. Jail by the United States Parole Commission. In 2021, Mr. Petty pleaded guilty to robbery and unlawful possession of a firearm, and was subsequently sentenced to 66 months of incarceration, followed by three years of supervised release. Mr. Petty completed the terms of incarceration and began his period of supervised release on July 11, 2025, where he was complying with supervision requirements and making a satisfactory adjustment.

On September 15, 2025, based on an interview with a complaining witness, Mr. Petty was arrested for misdemeanor simple assault and misdemeanor second-degree theft. On September 16, 2025, the following day, Mr. Petty was promptly released back to the community by the Superior Court of the District of Columbia on his own personal recognizance and ordered to appear in court again on November 20, 2025.

The United States Parole Commission issued a warrant application for Mr. Stanley on September 19, 2025, which was executed on September 24, 2025. Mr. Petty has been incarcerated at the D.C. Jail since, awaiting his probable cause hearing, scheduled for October 6, 2025. This probable cause hearing, as well as his continued incarceration, are unauthorized, as the U.S. Parole Commission does not have authorization to conduct any functions after September 30, 2025.

### C. Michael Dunbar

Plaintiff Michael Dunbar is a 30-year-old Black man who is on supervised release in Washington, D.C. and is currently being held at the D.C. Jail by the United States Parole Commission. In 2023, Mr. Dunbar pleaded guilty to attempted second degree burglary and was sentenced to 14 months of incarceration and three years of supervised release. Mr. Dunbar began serving his current term of supervised release on March 19, 2025.

On April 16, 2025, the Commission issued a warrant charging Mr. Dunbar with technical violations of supervised release and a new law violation related to the destruction of property. Mr. Dunbar was held on a $50 cash bond in relation to the misdemeanor destruction of property case, which was subsequently dismissed on August 1, 2025. At that point, Mr. Dunbar was detained pursuant to the Commission warrant.

On August 8, 2025, the Commission held a probable cause hearing for Mr. Dunbar. Mr. Dunbar stated that he has previously had issues with substance use, but has since resolved these issues. The hearing examiner determined there was probable cause but that incarceration was not appropriate. Instead, she recommended that Mr. Dunbar be reinstated to supervision and released to the community to receive bed-to-bed treatment. Despite this recommendation, on August 11, 2025, the Commission denied release and ordered Mr. Dunbar to be held in custody pending a revocation hearing. No reason was provided for the denial of release.

On October 1, 2025, the Commission held a final revocation hearing for Mr. Dunbar. At the hearing, Mr. Dunbar's counsel objected to the hearing, stating that the Commission's authorization had lapsed as of September 30, 2025 and that the Commission thus had no authority to hold a revocation hearing. The hearing examiner stated that the Commission had been directed by the Attorney General to continue operations. The examiner recommended that Mr. Dunbar

remain at the D.C. Jail and complete the Residential Substance Abuse Treatment Program (RSAT), an inpatient substance abuse program there, and suspended any further revocation proceedings pending his completion of RSAT. As of the date of filing, the Commission has not issued a Notice of Action in response to this recommendation.

Mr. Dunbar remains at the D.C. Jail, unable to access the community-based substance abuse treatment that a hearing examiner previously recommended for him. His October 1, 2025 revocation hearing as well as his continued incarceration are unauthorized, as the Commission has not been authorized to conduct any functions after September 30, 2025.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999). The Circuit has suggested, but not decided, that an independent showing of likelihood of success is required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22). Under either approach, Plaintiffs make the necessary showing here. Standards for issuing a temporary restraining order and a preliminary injunction are "the same" and can therefore be analyzed together. *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016).

11

**A. Plaintiffs are likely to succeed on the merits of their claims.**

The Commission is currently issuing arrest warrants, detaining, revoking supervision, and subjecting Plaintiffs and members of the putative class to further terms of incarceration without Congressional authorization. Plaintiffs are likely to succeed on the merits of their three claims: (1) The Administrative Procedure Act requires that courts "set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is undertaken "without observance of procedure required by law," 5 U.S.C. § 706(2); (2) Habeas Corpus extends to individuals "in custody in violation of the Constitution or laws . . . of the United States," 28 U.S.C. § 2241(c)(3); and (3) *Ultra vires* claims provide relief from agencies acting "without the authority to do so," *Adamski v. McHugh*, 304 F. Supp. 3d 227, 237 (D.D.C. 2015). All three of these claims ask the same question: Does the Commission have Congressional authorization to issue arrest warrants, detain, and sentence individuals to further incarceration? The answer is no, because, effective last night, Congress has abolished the Parole Commission.

Administrative agencies are "creatures of statute. They accordingly possess *only* the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (emphasis added). In 1976, Congress created the United States Parole Commission. *See* 18 U.S.C. § 4202. In Title 18, Chapter 311, Congress both created the Commission and provided it with authority over decisions relating to the granting and revoking of parole supervision. Two decades later, Congress expanded the Parole Commission's jurisdiction to include individuals on supervised release and parole for D.C. Code offenses. *See* D.C. Code 24-133(c)(2).

But in 1984, Congress imposed an expiration date on all of the "authority that [it] ha[d] provided" the Parole Commission. *See Nat'l Fed'n of Indep. Bus*, 595 U.S. at 117. Through the Comprehensive Crime Control Act, Congress abolished both indeterminate sentences and the Parole Commission that administered them. *See* Pub. L. 98-473, Title II, § 218 (repealing 18 U.S.C. § 4201 et seq.). Congress was unequivocal—the purpose of this law was to "abolish" the Parole Commission because it is a "costly and cumbersome institution" and "dividing the sentencing authority between the judge and the Parole Commission" "promotes disparity and uncertainty." S. Rep. No. 98-225 (1983). And it provided a five-year phase-out period until the Commission would "cease to exist" in 1992. *Walden v. U.S. Parole Comm'n*, 114 F.3d 1136, 1139 (11th Cir. 1997). After the "expiration" of the Parole Commission, its "authority over any remaining parolees transfer[s] to district court." *Id.* This expiration date has been extended many times since then, most recently in a March 2025 continuing resolution that expired on September 30, 2025. Because that continuing resolution has now expired, the Commission's repeal has taken effect.

Importantly, the Commission's repeal is not just a product of the government shutdown. The continuing resolution that failed to pass yesterday evening did not provide for the Commission's continued existence as continuing resolutions have in the past. *See* H.R. 5371, 119th Cong. (2025). Nor has Congress decided to further delay the Commission's demise in a separate bill. There is no question that, as of today, the Parole Commission's repeal has taken effect. Indeed, the Parole Commission itself understands that without a further extension of the repeal that was originally set to take effect in 1992, it is not legally authorized to "allow for the continued resolution of US Code parole and DC Code parole and supervised release cases." Ex. D, United States Parole Commission 2022 Budget Report.

Despite this obvious expiration of Congressional authorization, the Commission has decided to "proceed with normal operations." Ex. A, October 1, 2025 Email Correspondence. These "normal operations" include issuing warrants for arrest, holding probable cause hearings that can (and usually do) lead to months of detention, and holding revocation hearings that result in additional prison sentences.[14] The Commission is taking these actions even though it has been abolished by Congress. The "delegated power" of the Commission "expired when it went out of existence." *Phillips v. Fidalgo Island Packing Co.*, 238 F.2d 234, 235 (9th Cir. 1956). Any "action" since the "expiration of [the] delegation of power" is "void" because the Commission has "no delegated authority to act." *Id.*

The Commission's actions are unlawfully depriving Plaintiffs of their liberty. Kenan Braxton, Stanley Petty, and Michael Dunbar remain at the D.C. Jail under the sole authority of an agency that no longer legally exists. In short, the Commission is continuing to detain individuals and revoke their supervision, subjecting them to additional incarceration despite lacking Congressional authorization to do so.

The expiration of the Commission at a time when individuals were still subject to its authority was always to be expected. Indeed, Congress had always anticipated that the Commission would be abolished while people were still on supervision in the community or in prison awaiting a parole decision. In line with the guiding principle behind Congress's reforms in 1984—to end reliance on an agency whose decision-making is based on an "outmoded model"—Congress provided that a judge would instead make decisions regarding supervision. S. 1762,

---

[14] While it is continuing to detain individuals and sentence them to further incarceration, the Commission has indicated that it will *not* be holding parole grant hearings that allow eligible individuals to seek release from incarceration pursuant to an indeterminate sentence. *See* Ex. B, September 29, 2025 Email Correspondence.

14

Report of the Committee on the Judiciary, Comprehensive Crime Control Act of 1983, at 38–41; *see also Walden v. U.S. Parole Comm'n*, 114 F.3d 1136, 1139 (11th Cir. 1997) (noting that the Parole Commission's authority "will not transfer to the district court until the day *after* the expiration of the phaseout period and the complete dissolution of the Parole Commission"). In particular, in its 1984 law abolishing the Commission, Congress clarified that the laws providing for the granting and revocation of supervision "shall remain in effect as to the individual until the expiration of his sentence, except that the district court shall determine . . . whether release should be revoked or the conditions of release amended for violation of a condition of release." Pub. L. 98-473 § 235(B)(ii).

Even the Commission itself has acknowledged that judges are more appropriately suited for this role in Washington, D.C. In 2019, Patricia Cushwa, Chairman of the United States Parole Commission, published a "Transfer of Duties Plan" lamenting that Congress's intended abolition of the Parole Commission in 1987 had "become a thirty-three-year quandary."[15] As to the supervision of individuals convicted of D.C. Code offenses, Chairman Cushwa explained that "it is seemingly inappropriate to have a federal agency with a national focus exerting control over local Washington, DC cases," and instead such cases should "be placed under the supervision of the DC Superior Court."[16]

Accordingly, Plaintiffs and putative class members seek a writ of habeas corpus releasing them from unlawful detention because Defendants lack authority to take any action, including issue warrants, detain, revoke, or subject them to a further term of incarceration. Plaintiffs additionally request that the Court enjoin the Commission from taking any action against putative

---

[15] Letter from Patricia K. Cushwa, *supra* note 1.

[16] *Id.*

class members, including issue warrants, detain, revoke, or subject them to a further term of incarceration. Finally, Plaintiffs request a declaration that the Commission lacks authority to act, including to issue warrants, detain, revoke, or subject individuals to a further term of incarceration, and that these actions can only be undertaken by a judicial officer.

### B. Continued detention is causing irreparable harm.

Without relief, Plaintiffs and class members are suffering and will continue to suffer irreparable harm. "[D]eprivations of physical liberty of the type suffered by Plaintiffs are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases). "Courts have likewise recognized that the 'major hardship posed by needless prolonged detention' is a form of irreparable harm." *Id.* (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). Plaintiffs are incarcerated at the D.C. Jail by an agency that no longer has any authority to detain them. This prolonged deprivation of physical liberty is a *per se* irreparable harm. The harm is compounded by the lawlessness by which the Commission is operating. The Commission itself has been abolished. So too have the procedures that govern it and the remedies that were available to those subject to its action.

Detention for even short periods of time is harmful. "Because a new period of incarceration, even if only 24 hours in length, may cost [someone on supervision] his employment, and further jeopardize his chances for rehabilitation, the detention of an alleged violator is a serious matter and must be dealt with in a manner which clearly recognizes the degree of loss to be suffered." S. Rep. No. 94-369, at 339 (1975). People who are incarcerated can experience, *inter alia*: worsening mental illness, since conditions in jail can put a person under extreme stress and restrict access to needed medications; a high likelihood of being assaulted, including sexual

assault, especially in the first few days of incarceration; exposure to communicable diseases; inability to exercise; deprivation of sunlight and fresh air; and forcible separation from children and family. By being incarcerated, people undergo numerous external consequences as well, including loss of income (people often lose their jobs while detained); loss of housing and missed payments on utilities and other bills (people cannot make rent and other payments when jailed); and loss of physical or legal custody of their children (children of incarcerated parents regularly end up in the dependency system due to no caregiver being available outside of jail).[17]

Plaintiffs' irreparable harm is heightened by the dangerous conditions in the D.C. Jail, where they are incarcerated. A report by the Office of the District of Columbia Auditor issued recently found that the D.C. Jail has a death rate more than three times the national average, including 1,595 maintenance reports that demonstrated an immediate risk to health and safety. Ex. E, D.C. Auditor Report at 17, 48. In the same vein, in 2023, a federal class action lawsuit was filed against D.C. for failing to provide constitutionally adequate medical care to people in the D.C. Jail. *See V.C. et al., v. District of Columbia*, No. 23-cv-01139 (D.D.C. 2023). That suit remains pending.

A report by the U.S. Marshals after an inspection of the D.C. Jail confirmed that residents live in "large amounts of standing sewage" and lack access to clean water.[18] Even more recently, the D.C. Auditor's report detailed numerous and egregious health and safety failures at the D.C.

---

[17] Sam McCann, *How "Collateral Consequences" Keep People Trapped in the Legal System*, Vera Institute of Justice (Nov. 29, 2023), https://www.vera.org/news/how-collateral-consequences-keep-people-trapped-in-the-legal-system.

[18] U.S. Dep't of Justice, United States Marshals Service, Memorandum to Quincy Booth re: D/DC USMS Prisoners Detained by District of Columbia Department of Corrections, https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/?itid=lk_interstitial_manual_10.

Jail, including "broken and malfunctioning . . . plumbing." Ex. E, D.C. Auditor Report at 1. The nutrition—and lack thereof—at the D.C. Jail is likewise hazardous. As the D.C. Auditor explained, "[r]esidents and staff have reported food contaminated with rotten or inedible materials, including bugs, rodents, and screws, improperly heated meals, and potentially contaminated water." Ex. E, D.C. Auditor Report at 2. Finally, incarceration makes communities less safe: just two or three days of pretrial detention increases the risk of arrest on new charges for even low-risk persons.[19]

### C. The balance of equities tips in Plaintiffs' favor and the public interest supports granting the injunction.

The balance of the equities weighs heavily in Plaintiffs' favor. In evaluating this factor, the Court must "balance the competing claims of injury, which involves considering the effect on each party of the granting or withholding of the requested relief." *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018) (internal quotation omitted). Where, as here, "the Government is the opposing party," the determination of the third and fourth factors regarding "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As an initial matter, Defendants have no legitimate interest in breaking the law. "The Government cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation omitted). Here the Commission is issuing arrest warrants, detaining, and revoking supervision for individuals who have either been accused of solely technical violations of supervision (e.g., non-criminal conduct

---

[19] *See* Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, Nat'l Inst. of Corr., at 16–17 (2014), http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf.

like missing appointments with a supervision officer), or who have been released by a court that decided not to detain them pretrial.

Similarly, the public interest weighs heavily in Plaintiffs' favor. The public certainly has an interest in not having extra-legal, unauthorized actors jailing D.C. residents. *General Elec. Co. v. Seamans*, 340 F. Supp. 636, 641 (D.D.C. 1972) ("There is little doubt that the overriding public interest lies in having the governmental agencies follow their own regulations."). That interest is only more pronounced where people's liberty is implicated, as it is here.

## **CONCLUSION**

For the reasons explained above, Plaintiffs respectfully requests that this Court issue writs of habeas corpus releasing them from unlawful detention; enjoin the Commission from taking any action against putative class members, including issue warrants, detain, revoke, or subject them to a further term of incarceration; and declare that the Commission lacks authority to act, including to issue warrants, detain, revoke, or subject individuals to a further term of incarceration, and that these actions can only be undertaken by a judicial officer. Plaintiffs also respectfully request that this Court set a date for a hearing, pursuant to Local Rule 65.1(d).

DATED: October 1, 2025          Respectfully submitted,
        Washington, D.C.

                             */s/ Hanna M. Perry*
                             Hanna Perry (D.C. Bar No. 90003756)
                             Zoé Friedland (D.C. Bar No. 1781910)
                             Teressa Hamsher (D.C. Bar No. 90009447)
                             Megan Yan (D.C. Bar No. 1735334)
                             Public Defender Service for the District of Columbia
                             633 3rd St. N.W.
                             Washington, D.C. 20001
                             Tel. 202-824-2198
                             Fax 202-824-2093
                             hperry@pdsdc.org

zfriedland@pdsdc.org
thamsher@pdsdc.org
myan@pdsdc.org