UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KENAN BRAXTON, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES PAROLE COMMISSION, *et al.*, <br><br> *Defendants*. | Civil Action No. 25 - 3534 (SLS) <br><br> Judge Sparkle L. Sooknanan |

## MEMORANDUM OPINION

This case involves significant questions about the legitimacy of the United States Parole Commission in light of the ongoing federal government shutdown. Kenan Braxton, Stanley Petty, and Michael Dunbar are D.C. Code offenders who were recently arrested and detained by order of the Parole Commission for violations of the conditions of their supervised release. They bring this putative class action challenging the Commission's authority to order their detention or incarceration. They allege that the Commission was abolished at 12:01 a.m. on October 1, 2025, when Congress failed to pass a budget and extend the expiration date for the Commission's enabling statute. They now ask the Court to enter a preliminary injunction declaring that the Commission has no authority to act and ordering the release of 70 individuals currently incarcerated for violations of the conditions of their supervised release. The Court declines to take such extreme action.

Congress created the Parole Commission in 1976 to moderate the disparities resulting from indeterminate sentencing in federal criminal cases. Eight years later, as part of a suite of sentencing reforms, Congress abolished federal parole and set a five-year period to ultimately phase out the

Commission. But Congress extended that sunset, and in 1997, it gave the Commission new responsibilities by abolishing the D.C. Parole Board and charging the Commission with supervision of D.C. offenders. The 1997 statute seemed to contemplate a permanent role for the Commission with respect to D.C. offenders, though Congress never changed the prior law winding down the Commission. Instead, Congress has repeatedly extended the life of the Commission, most recently by including such extensions in continuing resolutions providing appropriations for the federal government. Thus, when Congress failed to pass a budget by midnight on September 30, 2025, it also failed to extend the authority of the Parole Commission.

The Plaintiffs' allegations in this case are grave. The Court takes seriously the prospect that the Commission is ordering the arrest and detention of D.C. offenders without legal authority to issue such orders. But at the same time, the Commission has been lawfully overseeing the supervision of D.C. Code offenders for nearly three decades. And there is no entity in place to take over these responsibilities. The Plaintiffs' proposed solution is extraordinary. They ask this Court to shutter the Parole Commission and issue a conditional writ releasing 70 individuals currently incarcerated *unless* the D.C. government (which is not a party to this suit) takes action in seven days to create or designate a new entity to assume the Commission's responsibilities. That is quite a task. Indeed, the Plaintiffs admit that the D.C. government has been unable to accomplish it despite repeated calls to do so over the past two decades. And what if the seemingly impossible proves to actually be impossible? The Plaintiffs propose that these 70 individuals be released and that approximately 1,600 D.C. offenders be effectively released from supervision with no entity in place to enforce violations of the conditions of their supervised release.

Such relief would blow up the existing supervised release system in the District, causing disruption and uncertainty for the offenders on supervision, the courts that sentenced them, the

government agencies involved in overseeing their supervision, and the public. And the Plaintiffs ask the Court to light this fuse knowing that shortly afterwards, Congress may pass a budget and clarify that the Commission retains its longstanding authority to oversee D.C. Code offenders, requiring the reassembly of the supervision program the Court has dismantled.

The Plaintiffs have not demonstrated that this relief is warranted. They may ultimately succeed in this litigation. At this early stage, however, the Plaintiffs have not sufficiently shown that they will be irreparably harmed in the absence of the preliminary injunction they request. Nor have they shown that the balance of equities and the public interest favor granting such relief. For these reasons, which are explained in greater detail below, the Court denies the Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### A.   Statutory Background

Congress established the United States Parole Commission in 1976 to "provide fair and equitable parole procedures" for federal prisoners. Parole Comm'n and Reorganization Act, Pub. L. No. 94–233, 90 Stat. 219, 219 (1976). At the time, the federal government employed a system of "indeterminate sentencing" in criminal cases. *Mistretta v. United States*, 488 U.S. 361, 363 (1989). "Statutes specified the penalties for crimes but nearly always gave the sentencing judge wide discretion to decide whether the offender should be incarcerated and for how long, whether he should be fined and how much, and whether some lesser restraint, such as probation, should be imposed instead of imprisonment or fine." *Id.* The almost "unfettered discretion" afforded to the sentencing judge under this regime led to "[s]erious disparities in sentences." *Id.* at 364–65.

Congress created the Parole Commission "to moderate" those disparities. *United States v. Addonizio*, 442 U.S. 178, 189 (1979). Congress empowered the Commission to make "[t]he final determination of precisely how much time an offender must serve," so it could "balanc[e]

differences in sentencing policies and practices between judges and courts in a system that is as wide and diverse as the Federal criminal justice system." H.R. Rep. No. 94–838, at 19 (1976) (Conf. Rep.). To accomplish this task, Congress entrusted the Commission with determining who could be released on parole, what the conditions of their parole would be, and when and whether their parole should be modified or revoked. Parole Comm'n and Reorganization Act § 4203 (setting out the "Powers and duties of the Commission"). Congress also tasked the Commission with promulgating "rules and regulations establishing guidelines" for how it would exercise its powers to "carry out a national parole policy." *Id.*

Unfortunately, the Commission could not solve the problems with indeterminate sentencing, and in 1984, Congress revisited the issue. Congress found that "the indeterminate-sentencing system had two 'unjustifi[ed]' and 'shameful' consequences." *Mistretta*, 488 U.S. at 366 (quoting S. Rep. No. 98–225, at 38, 65 (1983)). "The first was the great variation among sentences imposed by different judges upon similarly situated offenders. The second was the uncertainty as to the time the offender would spend in prison." *Id.* To address these "undesirable consequences," *id.*, Congress enacted two major reforms. It created the United States Sentencing Commission to enact sentencing guidelines aimed at promoting greater consistency and uniformity in sentencing. *See* Sentencing Reform Act of 1984, Pub. L. No. 98–473, § 991, 98 Stat. 1987, 2017 (1984) (setting forth the "establishment and purposes" of the U.S. Sentencing Commission); 28 U.S.C. § 991. And of particular importance here, it replaced federal parole with supervised release, which is overseen entirely by the federal courts rather than the Parole Commission. *See* 18 U.S.C. § 3583 (detailing how judicial officers set the terms and conditions of supervised release and determine if an individual's supervised release should be modified or revoked); *see also* Fed. R. Crim. P. 32.1. In so doing, Congress eliminated the "division of authority between the

4

sentencing judge and the parole officer" that had undermined efforts to make the sentencing of offenders and the time they actually served more standardized and predictable. *See Mistretta*, 488 U.S. at 366; *see also Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1093 (D.C. Cir. 2022).

In abolishing federal parole, Congress also enacted a plan to phase out the Parole Commission. Specifically, the Sentencing Reform Act provided that the Commission would cease to exist five years after the Act became effective. *See* § 235(b) (repealing "Chapter 311 of title 18, United States Code. 18 U.S.C. § 4201 et seq."—which establishes the Parole Commission—but providing that it would "remain in effect for five years after the effective date" of the legislation). During this five-year phaseout period, all laws relating to parole would remain in effect while the Commission wound up and "discharge[d] its final responsibilities toward those sentenced under the preexisting law." *Romano v. Luther*, 816 F.2d 832, 837 (2d Cir. 1987) (discussing § 235(b)). At the end of the five-year period, individuals still on parole would remain subject to the "then-repealed parole laws until their sentences expire[d]" but the authority to "revoke or modify" their parole conditions would transfer from the Parole Commission to the relevant federal district court. *Walden v. U.S. Parole Comm'n*, 114 F.3d 1136, 1139 (11th Cir. 1997) (citing § 235(b)(4)).

The end of the Commission's five-year phaseout period was initially set for November 1, 1992. *Id.* at 1138. Shortly before that date, however, Congress opted to extend the life of the Commission until 1997. *See* Fed. Courts Study Comm. Implementation Act of 1990, Pub. L. No. 101–650, § 316, 104 Stat. 5089, 5115 (1990) (changing year references in the Commission's sunset provisions from "five years" to "ten years"). Then in 1996, Congress provided another five-year extension. *See* Parole Comm'n Phaseout Act of 1996, Pub. L. No. 104–232, § 2, 110 Stat. 3055, 3055 (1996) (changing the year references in the Commission's sunset provisions from "ten years" to "fifteen years"). These extensions enabled the Commission to continue "oversee[ing]

cases of prisoners sentenced under prior law"—*i.e.*, the prior indeterminate-sentencing regime—while keeping the Commission on a path to eventual elimination. *Id.*

In 1997, however, Congress seemed to breathe new life into the Commission. In the National Capital Revitalization and Self-Government Act of 1997, Congress abolished the D.C. Board of Parole and provided that the U.S. Parole Commission would assume the Board's responsibility for overseeing the parole of offenders who committed felonies "under the District of Columbia Code." Pub. L. No. 105–33, § 11231, 111 Stat. 712, 745 (1997); D.C. Code § 24-131(a). In so doing, Congress granted the Commission authority over D.C. offenders sentenced to supervised release and increased the authorized number of Parole Commissioners to five—a bump up from the two-commissioner cap imposed by the 1996 Phaseout Act. §§ 11231, 11233.

Notably, the Revitalization Act did not expressly extend the sunset date for the Commission beyond the 2002 date set by the Phaseout Act. But when that date approached, Congress chose to again kick the can down the road. *See* 21st Century Dep't of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 11017(a), 116 Stat. 1758, 1824 (2002) (extending the fifteen-year sunset period to eighteen years). In the two decades since that extension, Congress has kicked that can again, and again, and again, often a little less far than the time before. *See, e.g.*, U.S. Parole Comm'n Extension and Sentencing Comm'n Authority Act of 2005, Pub. L. No. 109–76, § 2, 119 Stat. 2035, 2035 (2005) (extending by three years); U.S. Parole Comm'n Extension Act of 2008, Pub. L. No. 110–312, § 2, 122 Stat. 3013, 3013 (2008) (extending by three years); U.S. Parole Comm'n Extension Act of 2011, Pub. L. No. 112–44, § 2, 125 Stat. 532, 532 (2011) (extending by two years).

In recent years, Congress's extensions have gone from years to months and have gotten tangled up in the continuing resolutions that Congress has repeatedly passed to avoid shutting

down the federal government. In September 2024, for example, Congress extended the Commission's sunset date for the three-month duration of its continuing resolution. *See* Continuing Appropriations Act, 2025, Pub. L. No. 118–83, §§ 106(3), 121, 138 Stat. 1524, 1526, 1528 (2024). When December 2024 rolled around, Congress added another three months. *See* American Relief Act, 2025, Pub. L. No. 118–158, § 101(1), 138 Stat. 1722, 1723 (2024). And, finally, in March 2025, Congress extended the Commission's sunset date until September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, §§ 1106, 1115, 139 Stat. 9, 12, 15 (2025). That, of course, brings us to the present day. On September 30, 2025, when Congress failed to pass an appropriations bill—leading to the ongoing federal government shutdown—it also failed to expressly extend the Commission's sunset provision.

### B.   Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).

Kenan Braxton has been serving a term of supervised release since February 2024, following D.C. Code felony convictions in 2023. Compl. ¶ 48, ECF No. 1. Mr. Braxton was arrested on September 10, 2025, "pursuant to a Parole Commission warrant" alleging that he had violated certain terms of his release by failing to submit to drug testing or report to his supervising officer on multiple occasions. Compl. ¶ 51. Mr. Braxton is "currently being held at the D.C. Jail . . . pending a final revocation hearing" regarding his alleged violations. Compl. ¶ 47.

Stanley Petty began a three-year term of supervised release in July 2025, after being incarcerated for D.C. Code felony convictions in 2021. Compl. ¶¶ 55–56. On September 15, 2025, Mr. Petty was arrested for "misdemeanor simple assault and misdemeanor second-degree theft."

Compl. ¶ 57. The next day, Mr. Petty was released on his own recognizance by the D.C. Superior Court and was ordered to appear again in court on November 20, 2025. Compl. ¶ 58. On September 19, 2025, however, the Parole Commission "issued a warrant application" for Mr. Petty, which was executed on September 24, 2025. Compl. ¶ 59. Since that date, Mr. Petty has been incarcerated at the D.C Jail. Compl. ¶ 60. On October 8, 2025, the Commission ordered that Mr. Petty continue to be detained pending a revocation hearing. Pls.' Suppl. Mem. Supp. Mot Prelim. Inj. (Pls.' Suppl. Mem.), Ex. G, ECF No. 18-2.

Michael Dunbar began a three-year term of supervised release in March 2025 following his incarceration for D.C. Code felony convictions in 2023. Compl. ¶ 63. On August 8, 2025, a Parole Commission hearing examiner held a probable cause hearing related to allegations that Mr. Dunbar had violated the terms of his supervised release by using illicit substances and committing misdemeanor destruction of property. Compl. ¶¶ 64–67. The hearing examiner found probable cause but recommended that Mr. Dunbar be reinstated to supervision rather than be incarcerated. Compl. ¶ 68. The Commission ignored this recommendation and, on August 11, 2025, ordered that Mr. Dunbar be held at the D.C. Jail pending a revocation hearing. Compl. ¶ 69. At the revocation hearing on October 1, 2025, Mr. Dunbar's counsel objected to the hearing, "stating that the Commission's authority had lapsed as of September 30, 2025 and that the Commission thus had no authority to hold a revocation hearing." Compl. ¶ 71. The hearing examiner responded that the Commission had been ordered by the U.S. Attorney General to continue operations. Compl. ¶ 71; *see also* Pls.' Mot. TRO and Prelim. Inj. (PI Mot.), Ex. A, ECF No. 3-2. On October 6, 2025, the Commission revoked Mr. Dunbar's supervised release and sentenced him to 16 months of incarceration. Pls.' Suppl. Mem., Ex. F, ECF No. 18-1.

Mr. Braxton, Mr. Petty, and Mr. Dunbar seek to represent a class of similarly situated individuals under Federal Rule of Civil Procedure 23. Compl. ¶ 76. The proposed class includes "all people financially unable to obtain adequate representation who are on supervised release or parole for D.C. Code offenses and who are or will be detained solely by the Parole Commission and are pending action by the Parole Commission at midnight on October 1, 2025, or later." Compl. ¶ 76. Mr. Braxton, Mr. Petty, and Mr. Dunbar are among 70 individuals currently being detained on orders of the Commission for violations of the conditions of their supervised release. PI Mot. Hr'g Tr. at 22 (Oct. 20, 2025), ECF No. 28. And the Commission is currently supervising approximately 1,600 individuals serving terms of supervised release. *Id*. at 67–68.

### C.    Procedural Background

The Plaintiffs filed a Complaint in this Court on October 1, 2025. The Complaint alleges that the United States Parole Commission "does not have Congressional authority to exist" and thus its continued actions—including issuing arrest warrants and jailing individuals who have violated the terms of supervised release—are unlawful. Compl. at 1. Specifically, the Plaintiffs claim that the Defendants' actions are *ultra vires* and violate the Administrative Procedure Act, and that the Plaintiffs are entitled to a writ of habeas corpus. Compl. ¶¶ 86–97. To remedy these violations, the Plaintiffs seek declaratory and injunctive relief. Compl. at 15–16. On October 2, 2025, the Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction, PI Mot., ECF No. 3, as well as a Motion for Class Certification and Appointment of Class Counsel, ECF No. 9. On October 3, 2025, Judge Ana Reyes denied the Plaintiffs' Motion for a Temporary Restraining Order. Min. Order (Oct. 3, 2025). The case was subsequently assigned to this Court after Judge Reyes determined that it is not related to another case pending before her against the Parole Commission. ECF No. 17, 19. The Preliminary Injunction and Class Certification Motions

are now fully briefed and ripe for review. *See* Defs.' Opp'n Mot. TRO, ECF No. 12; Pls.' Suppl. Mem, ECF No. 18; Defs.' Opp'n Prelim. Inj., ECF No. 22; Pls.' Reply Supp. Prelim. Inj. (PI Reply), ECF No. 24; Defs.' Opp'n Mot. Class Certification, ECF No. 23; Pls.' Reply Supp. Class Certification, ECF No. 25.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

In assessing whether the Plaintiffs are entitled to preliminary relief, it is important to first identify the relief they are seeking. Notably, the Plaintiffs' requested relief has shifted over time. They initially sought immediate release from custody, *see* Proposed TRO and Prelim. Inj., ECF 3-7, but in later briefing appeared to soften this position in arguing that the "Court could order release within a short timeframe unless a judicial officer determines that detention is warranted," PI Reply at 20–21. The Court understood the Plaintiffs to be requesting that it order the D.C. Superior Court or this Court to hold expedited hearings to determine if individuals incarcerated pursuant to the Commission's authority should continue to be detained. At the most recent motion hearing, however, the Plaintiffs clarified that this is not the relief they seek. They are not asking the federal district court to take over supervision of the individuals currently supervised by the Parole Commission. *See* PI Mot. Hr'g Tr. at 31. Nor are they aware of any authority empowering this

Court to order the D.C. Superior Court to step into the Commission's shoes. *Id.* at 29–30, 32, 38. Instead, the Plaintiffs now seek a "conditional writ" that would give the D.C. government (presumably in consultation with Congress) *seven days* to create or designate a new agency to assume the Commission's responsibilities. *Id.* at 24, 27–30, 37–38. If no such entity is created or identified in seven days to review the detention decisions of the Parole Commission, the 70 individuals currently incarcerated on orders of the Commission would be released. *Id.* at 27–29. And the approximately 1,600 individuals serving terms of supervised release would effectively be released without any entity in place to enforce violations.

The Plaintiffs' request for preliminary relief comes up short on at least three of the four *Winter* factors. They have not shown that they will suffer irreparable harm in the absence of preliminary relief or that the balance of equities and the public interest favor granting the relief they request. Because these flaws are fatal, the Court denies the Plaintiffs' motion for a preliminary injunction without assessing their likelihood of success on the merits.

    **A.**    **Irreparable Harm**

A moving party seeking preliminary injunctive relief must "make some showing of irreparable harm" as a "threshold requirement" to obtaining such relief. *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 737, 747 (D.C. Cir. 1995)). The injury "must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). The D.C. Circuit "has said time and again that the degree of proof required for irreparable harm is high, and that a failure to surmount it provides grounds for refusing to issue a preliminary

injunction, even if the other three factors entering the calculus merit such relief." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (cleaned up).

Here, the Plaintiffs have not sufficiently shown that they are "likely to suffer irreparable harm" in the absence of the preliminary injunctive relief they seek. *Winter*, 555 U.S. at 20. The Plaintiffs attempt to establish irreparable harm in two ways. First, they argue that being detained by an agency that allegedly has no authority to detain them constitutes per se irreparable harm. Second, they suggest that the Commission imposes more severe sanctions (including incarceration) than would otherwise be imposed by judicial officers or others overseeing supervised release for D.C. offenders. The Court finds neither argument persuasive.

Taking these arguments in turn, the Plaintiffs primarily rest on the argument that they are irreparably harmed because they are being detained by an agency that has no authority to operate. *See* PI Mot. Hr'g Tr. at 82. But it is unclear how the Plaintiffs are being harmed at all by the Commission—rather than a different entity—overseeing their supervised release. While the Plaintiffs focus on the well-documented harms of detention and the current conditions at the D.C. Jail to establish irreparable harm, PI Mot. at 16−18, they have not shown that the relief they seek would result in their release. Assuming the Court shutters the Parole Commission, some other entity would need to make detention decisions. Indeed, the Plaintiffs themselves acknowledge that a finding that the Commission has no authority to act would not "disturb the existence of [their] terms of parole or supervised release," Pls.' Suppl. Mem. at 13, *see also* PI Reply at 8–10; would not disturb the "penalties attendant to violations of [their terms]," Pls.' Suppl. Mem. at 13; and would not remove the potential that violation of those terms could be sanctioned with "detention and revocation," PI Reply at 10. They acknowledge that any judicial officer stepping into the shoes of the Parole Commission may "order Plaintiffs or putative class members detained pending

12

revocation or even revoke supervised release and sentence them to terms of imprisonment." PI Reply at 11; *see also* PI Reply at 10 ("[I]f the Court enjoins the Commission from continuing to operate, Plaintiffs are not suddenly free from their terms of supervised release, the conditions attendant to their terms, or the potential of detention and revocation."). And their most recent requested relief—a conditional writ—assumes that the D.C. government will establish or designate an entity in seven days to make detention decisions. It is unclear, then, how the Plaintiffs are being concretely harmed—much less, irreparably harmed—by the Parole Commission's detention decisions.

The Plaintiffs cite *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) for the proposition that unlawful prolonged detention is per se irreparable harm. *See* PI Mot. at 16. But that case is readily distinguishable. In *Aracely*, asylum seekers alleged that they were being unlawfully detained while their asylum petitions were evaluated. 319 F. Supp. 3d at 120. Specifically, they alleged that the Department of Homeland Security (DHS) had detained them based on an unwritten and unconstitutional policy that took "immigration deterrence" into account "when making parole determinations." *Id.* at 120, 157. The court found that the plaintiffs were likely to show that DHS's unlawful policy "played a significant role in the repeated denials of [their] parole requests," and that they were thus entitled to "proper parole determinations" that would provide them "an avenue through which to secure their liberty." *Id.* at 149, 156.

Here, by contrast, the Plaintiffs do not assert that the Parole Commission relied on unlawful considerations when determining that they should be detained. While the Plaintiffs are critical of the Commission's apparent willingness to arrest and detain individuals based on "administrative" or "technical violations" of their supervised release, Comp. ¶¶ 15–16, again, they do not assert that they cannot be punished for those violations or that such punishment cannot include incarceration.

13

It is thus not clear that the Plaintiffs are "endur[ing] purportedly inappropriate detention" like the asylees in *Aracely*. 319 F. Supp. 3d at 155.

The Plaintiffs also point to *American Federation of Teachers v. Bessent*, 765 F. Supp. 3d 482, 504 (D. Md. 2025), to argue that "[u]nauthorized agency action, especially when the government believes its actions are appropriate and therefore unlikely to end, can amount to irreparable harm." Pls.' Suppl. Memo at 21. That case, too, is distinguishable. There, the plaintiffs sought to enjoin various "federal government agencies from disclosing records with their sensitive personal information to government personnel affiliated with the newly established Department of Government Efficiency" (DOGE). *Am. Fed'n of Tchrs.*, 765 F. Supp. 3d at 487. The court found that there was irreparable harm not simply because the agencies were acting without authority, but because the "continuing, unauthorized disclosure of the plaintiffs' sensitive personal information to DOGE" would cause them harm "that money damages cannot rectify." *Id.* at 504. By issuing an injunction, the court could prevent that harm. *Id.* at 505.

Here, as explained above, it is not clear what harm the Plaintiffs' requested injunctive relief would prevent. With or without an injunction and conditional writ, the Plaintiffs will remain subject to their terms of supervised release and may face penalties and incarceration for violating those terms from whichever entity is responsible for overseeing their supervision. The Court does not take lightly the Plaintiffs' allegation that the Commission has no authority to act. But the mere allegation that the Commission has acted without authority does not mean that the Plaintiffs have suffered or will suffer irreparable harm. Were the Commission to order tomorrow, for example, that all individuals on supervised release will have their supervision terms shortened by one year, it might not have authority to issue such an order, but the Plaintiffs would be hard pressed to argue that the order threatens to cause them irreparable harm.

The Plaintiffs' second argument does not move the needle for similar reasons. Focusing on the historical severity of the Commission's detention decisions, they suggest that if another entity takes over for the Commission, that entity would impose less severe sanctions. PI Mot. Hr'g Tr. at 49–53 (suggesting that a court would release the named Plaintiffs for violations of the terms of their supervised release because a court chose not to detain them on new charges); *see also* PI Reply at 24 (noting that the "[n]amed Plaintiffs and putative class members are alleged to have committed only technical violations or have been released by a court as to an alleged law violation"); Compl. ¶¶ 16–17 (alleging that "arrests of people on supervision . . . are frequently the result of administrative violations of conditions of release" and that the Commission generally only arrests individuals alleged to have committed criminal conduct when they have already been "released by the court."). But that is nothing more than speculation and conjecture. Nothing in this record permits the Court to conclude that judges or a new parole board would be more lenient in punishing the Plaintiffs' alleged violations or less likely to impose incarceration as a punishment. Indeed, any new supervision authority may well impose the same or even stiffer penalties. In this sense, the Plaintiffs have not established that they will suffer any "certain" or "not theoretical" harm in the absence of their requested injunctive relief.

In sum, the Plaintiffs have not shown that the Commission actions they seek to enjoin have caused or will cause them "great, actual and not theoretical" injuries "of such imminence that there is a clear and present need for equitable relief." *Mexichem*, 787 F.3d at 555 (cleaned up). They thus have not satisfied the high degree of proof required for irreparable harm and are not entitled to a preliminary injunction. *Olu-Cole*, 930 F.3d at 529.

### B. Balance of Equities and Public Interest

Given the Plaintiffs' failure to show irreparable harm, the Court's analysis could end here. *Id.* at 529. Nevertheless, the Court feels compelled under these circumstances to address the balance of equities and public interest because they weigh strongly against granting the Plaintiffs' requested relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. When analyzing these factors, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (cleaned up). The court should also "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, (1982)).

Here, the Court finds that the balance of equities and the public interest tip sharply in the Defendants' favor. While it is not clear that the Plaintiffs will suffer irreparable harm in the absence of an injunction, granting the Plaintiffs' requested relief would have an immediate and significant impact on the Parole Commission by preventing it from overseeing the supervision of D.C. Code offenders as it has lawfully done for nearly three decades. The Plaintiffs' requested "conditional writ" would, under the best of circumstances, require the D.C. Superior Court or some newly created entity to make arrangements in under a week to assume supervision responsibility for approximately 1,600 D.C. Code offenders. Under the worst of circumstances—*i.e.*, if the D.C. government does not manage to designate or create an entity to assume supervision responsibility—the writ would cause 70 offenders with supervision violations to be released. And these offenders and the 1,600 others under supervision would suddenly have no entity authorized to hold them accountable for violations of their supervised release conditions.

In short, there is no situation in which the Plaintiffs' requested relief would not create significant disruption and uncertainty for the offenders under supervision, the government agencies and personnel involved with that supervision, and the public at large. It would also place extreme, if not wholly impracticable, demands on the D.C. Courts and D.C. Council to rapidly create a workable plan to reassert local control over D.C. offender supervision—something the District has been unable to do for decades and that would ultimately require Congressional action. *See* Mot. for Prelim. Inj. at 15 (citing a 2019 letter from Parole Commission Chairman Patricia Cushwa, which notes that "legislative action" similar to the 1997 Revitalization Act is "necessary to return [D.C. supervision cases] to CSOSA and D.C. Superior Court").

As the Supreme Court has previously noted, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. 25-cv-339, 2025 WL 1783899, at *10 (D.D.C. June 27, 2025) (collecting authorities supporting that an injunction is a stopgap measure intended to preserve the status quo). Here, entry of a preliminary injunction would seem to do the exact opposite. It would dramatically change the relative positions of the Parties. It would offer only uncertain and potentially ephemeral benefits to the Plaintiffs while at the same time subjecting the Defendants, other governmental entities, and the public, to significant risks and costs. And it would do all of this with the risk that Congress may act any day to end the current government shutdown, remove any uncertainty about the Commission's authority, and affirm that the status quo (in which the Commission continues to oversee D.C. offenders on supervised release) is just as it should be.

Under these circumstances, the balance of equities and the public interest weigh strongly against issuing preliminary relief.

\* \* \*

Because the Plaintiffs have failed to show irreparable harm or that the balance of equities and public interest favor relief, the Court declines to evaluate their likelihood of success on the merits of their claims. Given the serious issues at stake, however, the Court intends to move expeditiously to resolve the merits of this dispute and orders the Parties to jointly propose an expedited summary judgment briefing schedule.

## CONCLUSION

For the foregoing reasons, the Court denies the Plaintiffs' Motion for Preliminary Injunction, ECF No. 3.[1] The Court further orders that the Parties meet and confer and jointly file a proposed expedited summary judgment briefing schedule by November 6, 2025, for the Court's consideration.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   November 3, 2025

---

[1] Because preliminary relief is not warranted, the Court declines at this early stage to rule on the Plaintiffs' Motion for Class Certification. The Parties should explain in their proposed summary judgment briefing schedule whether further briefing on class certification is necessary.